# Exhibit B

Licensor Site Name / Number: SAN DIEGO, TX / 89206
Licensee Site Name / Number: KXTM  FM107.7 / N/A

**LICENSE AGREEMENT**

*329976*

ATC Contract No: TBD

This LICENSE AGREEMENT ("**Agreement**") made  as of the latter signature date hereof  ("**Effective Date**") by and between American Tower Management, LLC, a Delaware limited liability company, with a place of business at 10 Presidential Way, Woburn, MA 01801 ("**Licensor**") and Mary Helen Lopez, Individually, with a place of business at 115 West Avenue D, Robstown, TX 78380 ("**Licensee**").

## I.  TOWER FACILITY INFORMATION:
Site Name:      SAN DIEGO
Site Number:      89206
Address and/or location of Tower Facility: Off of 359/90, approx. 3.3 mi. S of 44/359, San Diego, TX, 78384-3907
Tower Facility Coordinates:      Lat. 27-43-25.63 N  Long. 98-16-14.49 W

## II.  NOTICE & EMERGENCY CONTACTS:
- Licensee's local emergency contact (name and number): Carlos Lopez (361) 904-1762.
- Licensor's local emergency contact: Network Operations Communications Center (800) 830-3365.
- Notices to Licensee shall be sent to the address above to the attention of Mary Helen Lopez.
- Notices to Licensor shall be sent to the address above to the attention of Contracts Manager.
- Licensor's Remittance Address: American Tower Corporation, Lockbox 7501, PO Box 7247, Philadelphia, PA 19170-7501; all payments shall include a reference to the Site Name and Site Number as identified above in Section I.

## III.  PERMITTED USE OF TOWER FACILITY BY LICENSEE:
Transmitting and Receiving frequencies: See Exhibit A for specific frequencies
Antenna mount height on tower: See Exhibit A for specific location
All other permitted uses of the Tower Facility including Licensee's Approved Equipment (as defined in the Appendix I), and the Licensed Premises (as defined in the Appendix I) are further described in section 4 of this Agreement and Exhibits A and B attached hereto.

## IV. FEES & TERM
Annual License Fee:   Sixteen Thousand Eight Hundred and 00/100 Dollars ($16,800.00), increased by the Annual Escalator on the first anniversary of the Commencement Date of this Agreement and each anniversary of the Commencement Date thereafter during the Term (as defined in Appendix I).  The Annual Escalator is 4%.

Application Fee: N/A

Relocation Application Fee: N/A

Site Inspection Fee: $750.00, increased annually on each anniversary of the Commencement Date of this Agreement by a percentage rate increase equal to the Annual Escalator.

Initial Term: A period of 10 years beginning on the Commencement Date.  The "**Commencement Date**" shall be the earlier of: (i) the date of Licensor's issuance of a NTP, (ii) 90 days from the date upon which this Agreement is sent to Licensee for execution; or (iii) September 5, 2012.

Renewal Terms: 2 additional periods of 5 years each.

Connection Fee: N/A

Electricity for operation of Approved Equipment is to be provided by (check one):
☒ Licensor, with the cost of such electricity to be paid by Licensee at the initial rate of $50.00 per month ("Utility Fee") subject adjustment pursuant to Section 5(b), OR
☐ Licensee, at its sole expense.

## V.  TERMS & CONDITIONS
The attached terms and conditions are incorporated herein by this reference.

## VI. OTHER PROVISIONS:
Other provisions:  (check one): ☐ None ☒ As listed below

    a) Notwithstanding anything to the contrary in this Agreement, the offer expressed to Licensee in this Agreement shall automatically become null and void with no further obligation by either party hereto if a structural analysis of the Tower Facility completed after the execution of this Agreement by Licensor but before the commencement of the installation of Licensee's Approved Equipment indicates that the Tower Facility is not suitable for Licensee's

#11552v4

Approved Equipment unless Licensor and Licensee mutually agree that structural modifications or repairs shall be made to the Tower Facility on mutually agreeable terms.

b)   In no event shall Licensee's use of the Tower Facility, or operation of any of its equipment thereon, be conducted in a manner that interferes with Licensor's lighting system located on any of the towers, building systems, or, in the event that Licensee's equipment is installed on the rooftop of a building, with equipment of any kind used by building tenants who are not tenants of the Licensor.  In the event that such interference does occur, Licensee shall be solely responsible to reimburse Licensor for any and all costs required to modify and/or upgrade Licensor's lighting system, to comply with all necessary FAA/FCC regulations, as a result of said interference.

c)   Licensor and Licensee agree and acknowledge that Licensee shall be responsible for painting the transmission lines to match the colors of the tower.

[SIGNATURES ARE ON THE NEXT PAGE]

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

#11552v4

Licensor Site Name / Number: SAN DIEGO, TX / 89206
Licensee Site Name / Number: KXTM  FM107.7 /  N/A

IN WITNESS WHEREOF, each Party in consideration of the mutual covenants contained herein, and for other good and valuable consideration, intending to be legally bound, has caused this Agreement to be executed by its duly authorized representative as of the date and year written; *provided, however,* that this Agreement shall not become effective as to either Party until executed by both Parties.

LICENSOR
American Tower Management, LLC, a
Delaware limited liability company
By: American Towers, Inc., its sole member

By: _____

Print Name: Richard Rossi

Its:  Vice President, Contract Management

Date: _____ 7-17-12

LICENSEE
Mary Helen Lopez, Individually

By: _____

Print Name: _____Mary Helen Lopez_____

Its: _____owner?_____

Date: _____7-6-12_____

#11552v4

**Terms And Conditions**

1. **DEFINITIONS**. Capitalized terms defined in the body of this Agreement are indexed by location on Appendix I attached hereto. Capitalized terms used in Agreement but not defined herein are defined in Appendix I.

2. **GRANT OF LICENSE**. Subject to the terms of this Agreement, Licensor hereby grants Licensee a non-exclusive license to install, maintain and operate the Approved Equipment at the Licensed Space. All Approved Equipment shall be and remain Licensee's personal property throughout the Term of this Agreement. Licensor shall maintain the Tower Facility in good order and repair, wear and tear, damage by fire, the elements or other casualty excepted. In no event shall Licensee's license as granted herein include rights to use the air space above the Approved Equipment, and Licensor reserves the right to install, construct and/or operate additional improvements or equipment of Licensor or others above Licensee's Approved Equipment, including Licensee's shelter (commonly referred to as "stacking"), provided that such additional improvements or equipment do not materially and adversely interfere with the access to or operation of the Approved Equipment, including Licensee's shelter. Licensee is not required to utilize a stackable shelter, provided that, if Licensee opts to install a shelter that is not stackable and if Licensor receives an offer to license the air space above Licensee's non-stackable shelter by a proposed subsequent user, Licensor may, at its election, upon 30 days prior written notice require Licensee to replace such non-stackable shelter with a stackable shelter of a comparable size, provided that the proposed subsequent user agrees in writing to be wholly responsible for the cost of Licensee's shelter replacement. Subject to any limitations contained in the Ground Lease, Licensor grants Licensee a right of access to the Tower Facility 24 hours per day, 7 days per week during the Term. Licensor grants Licensee a designated location for the installation of Licensee's utilities over, under or across the Tower Facility (collectively, "Easement"). Licensee shall be responsible for any and all Damage or loss that results from the installation of any cables or utility wires by Licensee or any company or person retained by Licensee (including a public utility company), including, without limitation, any damage or loss that results from the accidental cutting of utility wires or cables of any other party operating at the Tower Facility. Licensor shall provide Licensee with one set of keys and/or codes to access the Tower Facility. Licensee shall be responsible for ensuring that Licensor has, at all times, a complete and accurate written list of all employees and agents of Licensee who have been provided the keys or access codes to the Tower Facility. Licensor shall have the right to continue to occupy the Tower Facility and to grant rights to others to the Tower Facility in its sole discretion. Licensee shall have no property rights or interest in the Tower Facility or the Easement by virtue of this Agreement. If Licensor's right to license space on the Tower Facility to Licensee is subject to a right of first refusal for the benefit of a third party and if such third party exercises its right of first refusal prior to the Commencement Date, Licensor may terminate this Agreement upon written notice to Licensee.

3. **EXHIBITS**. Within 45 days following the commencement of the installation of the Approved Equipment, Licensee shall provide Licensor with as-built or construction drawings showing the Approved Equipment as installed [in both hard copy and electronic form] ("Construction Drawings"); such Construction Drawings shall include the location of any shelters, cabinets, grounding rings, cables, and utility lines associated with Licensee's use of the Tower Facility. Upon receipt, Licensor shall attach hereto the Construction Drawings as Exhibit C hereto. In the event that Licensee fails to deliver the Construction Drawings as required by this section, Licensor may cause such Construction Drawings to be prepared on behalf of Licensee and Licensor shall assess a fee for such Construction Drawings in an amount equal to 120% of the actual cost of obtaining the Construction Drawings including in-house labor, which upon invoicing shall become immediately due and payable by Licensee. In the event of inconsistency or discrepancy between (a) Exhibit A and Exhibit B hereto, Exhibit A shall govern, and (b) between Exhibit A (with respect to Approved Equipment and antenna locations) together with Exhibit B (with respect to Ground Space installation locations) and Exhibit C hereto, Exhibits A and B shall govern, notwithstanding any approval or signature by Licensor or its agents. Licensee hereby acknowledges and agrees that installation of the Approved Equipment must be in strict accordance with the approved Construction Drawings and Exhibit A and B. Notwithstanding the forgoing, Licensee shall not infer our shall acceptance of the Construction Drawings by Licensor be deemed to be a representation by Licensor that (i) such Construction Drawings or the plans and specifications described therein are in compliance with federal, state or local laws, ordinances, rules or regulations, (ii) that such installation shall not cause impermissible or unlawful interference, or (iii) that such installation is consistent with Licensee's permitted installation as specifically set forth in Exhibits A and B hereto.

4. **USE.** Subject to the terms of the Ground Lease, Licensee shall be permitted the non-exclusive right to install, maintain, operate, service, modify and/or replace its Approved Equipment at the Licensed Space, which Approved Equipment shall be utilized for the transmission and reception of wireless voice and data communications signals (such transmission and reception to be solely within the Permitted Frequencies, and, if the Permitted Frequencies include licensed spectrum, within the spectrum licensed to Licensee by the FCC). If as of the Effective Date, Licensee's wireless business consists of a one-way network which requires only that signals be transmitted from the Tower Facility, then notwithstanding the foregoing sentence, Licensee's use of Tower Facility under this Agreement shall be limited to the transmission of wireless voice and data communications signals. Licensee's permitted use with respect to the Licensed Space shall be limited solely to that enumerated in this section, and, except pursuant to separate agreement with Licensor, no person or entity other than Licensee shall have the right to install, maintain or operate its equipment or transmit or receive communications at, or otherwise use, the Licensed Space.

5. **LICENSE FEES; TAXES; ASSESSMENTS.**

a) **Annual License Fee**. The Annual License Fee as adjusted by the Annual Escalator, shall be pre-paid in advance of the Term that shall begin upon the Commencement Date.

(b) **Utilities**. Licensee agrees to install a separate meter on and connect to Licensor's multi-gang meter rack on or before the Commencement Date. Licensee shall pay the cost of all utility service necessary, including the Utility Fee and Connection Fee, to install, maintain and operate the Approved Equipment. The Utility Fee shall be payable in advance on the first day of each calendar month during the Term beginning upon the Commencement Date Licensee agrees to enter into a monitoring agreement with a third party to monitor Licensee's utility usage at the Tower Facility. Licensee shall provide to Licensor an annual report of its utility usage at the Tower Facility during the Term of this Agreement prepared by the third party monitoring company. Licensor shall review the annual usage report, and, if Licensor determines, in its sole discretion, that Licensee's utility usage increased by more than 10% over Licensee's utility usage as of the Commencement Date, or as of the date of the last Utility Fee increase resulting from increased utility usage, Licensor may, but is not required, to modify the Utility Fee by an amount equal to Licensor's actual increased costs incurred due to Licensee's increased utility usage. If such a modification in the Utility Fee is imposed, Licensor shall notify Licensee in writing of such increase in the Utility Fee. Any such change in the Utility Fee resulting from an increase in Licensee's utility usage will take effect with the next payment of the Utility Fee coming due after Licensee's receipt of such notice. Licensee shall obtain and pay the cost of telephone connections, the installation of which shall be in compliance with the procedures for installation and maintenance of Approved Equipment set forth herein.

b) **Taxes.** Licensee shall be responsible for the payment of any applicable taxes, fees or governmental assessments against any equipment, personal property and/or improvements owned, leased or operated by Licensee or directly associated with Licensee's use of the Licensed Space. Except as provided immediately hereinafter, Licensor shall pay all real property taxes Licensor is obligated to pay under the Ground Lease. Licensee shall reimburse Licensor for any increases in real property taxes which are assessed as a direct result of Licensee's improvements to or Approved Equipment located on the Tower Facility within 30 days of Licensor's request for such reimbursement. Upon Licensee's request, Licensor shall provide to Licensee copies of the documentation from the taxing authority, reasonably acceptable to Licensee, indicating that the increase results from Licensee's improvements or Approved Equipment.

c) **Federal Use Fees & Assessments**. Licensee agrees to pay directly or reimburse Licensor for any and all taxes, fees, or other costs and expenses assessed upon or paid by Licensor to the United States Forest Service or Bureau of Land Management attributable to Licensee's Approved Equipment, Licensee's use of or Licensee's presence at the Tower Facility.

d) **Payment Address**. All payments due under this Agreement shall be made to Licensor at Licensor's Remittance Address shown on page 1 of this Agreement or such other address as Licensor may notify Licensee of in writing.

e) **Restrictions on Reimbursement.** Solely for the purposes of determining Licensee's portion of such taxes, fees, assessments or similar expenses as contemplated in this Section 5 or anywhere else in this Agreement, if any such amounts are determined in whole or in part on the income or profits (aside from gross revenues) of any person or entity, Licensor and Licensee shall agree on a fixed amount (subject to the Annual Escalator, which shall be applied in the same manner as it is applied to the License Fee), that shall be treated as such tax, fee, assessment or similar expense in lieu of the actual amount, which agreed to amount shall be set forth in an amendment to this Agreement.

f) **No Set-Off**. All payments due under this Agreement shall be due without set-off, notice, counterclaim or demand from Licensor to Licensee.

g) **Effect of Partial Payment**. No endorsement or statement on any check or letter accompanying a check for payment of any monies due and payable under the terms of this Agreement shall be deemed an accord and satisfaction, and Licensor may accept such check or payment without prejudice to its right to recover the balance of such monies or to pursue any other remedy provided by law or in this Agreement.

6. **TERM.**

a) **Initial Term**. The Initial Term of this Agreement shall be as specified on page 1.

b) **Renewal Term**. The Term of this Agreement may be extended for each of the Renewal Terms as specified on page 1 of this Agreement, provided that at the time of each such renewal, (i) the Ground Lease remains in effect and has not expired or been terminated, (ii) Licensee is not in default hereunder and no condition exists which if left uncured would with the passage of time or the giving of notice result in a default by Licensee hereunder and (iii) the original Licensee identified on page 1 of this Agreement has not assigned, sublicensed, subleased or otherwise transferred

any of its rights hereunder except to a Permitted Affiliate (as defined in section 20 herein).  Provided that the foregoing conditions are satisfied, this Agreement shall automatically renew for each successive Renewal Term unless either Party notifies the other in writing of its intention not to renew this Agreement at least 180 days prior to the end of the then existing Term.

c) **Holdover Term.** If Licensee fails to remove the Approved Equipment at the expiration of the Term, such failure shall be deemed to extend the terms of this Agreement on a month-to-month basis under the same terms and conditions herein except that (i) a Monthly License Fee shall be due on or before the first day of every calendar month during such month-to-month term in an amount equal to 150% of the Monthly License Fee in effect for the last month of the Term ("Holdover Fee"), such Holdover Fee to escalate annually on the anniversary of the Commencement Date by an amount equal to 6% of the Holdover Fee in effect for the month immediately prior to the month in which escalation takes place, and (ii) the month-to-month extension shall be terminable upon 15 days' prior written notice from either Licensor or Licensee to the other; provided, however, nothing contained herein shall grant Licensee the unilateral right to extend the Term of this Agreement after the expiration of the Term.  In addition to the Monthly License Fee payable to Licensor in the event of an extension under this subsection 6(c), Licensee agrees to indemnify and hold Licensor harmless from any Damages arising out of or in connection with the extension, the operation of the Approved Equipment at the Tower Facility and Licensee's failure to perform all of its obligations under this Agreement at the termination or earlier expiration of this Agreement.

7. **COMMON EXPENSES**. Licensee shall reimburse Licensor for Licensee's pro-rata share of all common expenses (the "Common Expenses") incurred by Licensor in the installation, operation, maintenance and repair of the Tower Facility, including, but not limited to, the construction, maintenance and repair of a common septic system and field, insurance, common utilities and any and all other costs of operating and maintaining the Tower Facility.  Notwithstanding the foregoing, the cost and expenses associated with any Damage which is directly attributable to the acts or omissions of Licensee or Licensee's contractors shall be borne solely by Licensee.  Licensee shall not be required to pay any share of costs or expenses incurred to replace the Tower.  In the event that Licensee also licenses space within a building or shelter owned by Licensor on the Tower Facility, Licensee shall also reimburse Licensor for its pro-rata share of all Common Expenses incurred for the operation, maintenance, repair and replacement associated with such building or shelter, including, without limitation, the physical structure of the building, HVAC system, and common utility expenses.  In the event that Licensee is connected to a generator or back-up power supply owned by Licensor, Licensee shall also reimburse Licensor for its pro-rata share of all expenses incurred for the operation, maintenance, repair and replacement associated with such generator, including, without limitation, fuel expenses.  Licensee shall reimburse Licensor for Common Expenses within 30 days following receipt of an invoice from Licensor.   For the purposes of this section, a "pro-rata share" of costs and expenses shall be determined based on the number of licensees using the Tower Facility  (or with respect to a shared shelter or building, the number of licensees using Licensor's shelter or building) on the first day of the month in which an invoice is mailed to Licensee.

8. **SITE INSPECTION**.  Concurrent with Licensee's delivery of a fully executed Agreement to Licensor, and before the date of any subsequent modifications to or installation of additional Approved Equipment, Licensee shall pay Licensor the Site Inspection Fee as defined on page 1 of this Agreement.  In the event that Licensor installs Licensee's Approved Equipment, Licensor shall waive the Site Inspection Fee with respect to such installation. Licensee acknowledges that any site inspection performed by Licensor of Licensee's installation is for the sole purpose and benefit of Licensor and its affiliates, and Licensee shall not infer from or rely on any inspection by Licensor as assuring Licensee's installation complies with any Applicable Laws, that the installation was performed in a good, workmanlike manner or that such installation will not cause impermissible or unlawful interference.

9. **LABELING**.  Licensee shall identify its Approved Equipment, including its equipment cabinets and coaxial cable (at the top and bottom of the Tower) (unless such cabinet is located in a building or cabinet owned by Licensee) by labels with Licensee's name, contact phone number and date of installation.  In the event that Licensee fails to comply with this provision and fails to cure such deficiency within 10 days of Licensor's written notice of such failure, Licensor may, but is not obligated to, in addition to any other rights it may have hereunder, label the Approved Equipment and assess against Licensee a fee of $1,500 which shall be payable to Licensor upon receipt of an invoice therefor.  Licensor shall not be responsible to Licensee for any expenses or Damages incurred by Licensee arising from the interruption of Licensee's service caused by Licensor, if Licensor is unable to identify the Approved Equipment as belonging to Licensee as a result of Licensee's failure to label such Approved Equipment.

10. **IMPROVEMENTS BY LICENSEE.**

a) **Installation and Approved Vendors.** Prior to the commencement of any Work on the Tower Facility, Licensee shall submit to Licensor for review and approval, which approval shall not be unreasonably withheld, detailed plans and specifications accurately describing all aspects of the proposed Work. Licensee shall provide notice to Licensor no less than 5 days prior to the date upon which Licensee intends to commence Work at the Tower Facility, together with a construction schedule, so Licensor has the opportunity to be present during any such Work. Licensee shall not commence Work on the Tower Facility until Licensor issues to Licensee a NTP.  Licensor shall issue a NTP only upon request from Licensee and receipt of the following complete and accurate documentation:

(1) evidence that any contingencies set forth in the approval of Licensee's Application have been satisfied; (2) evidence that Licensee has obtained all required governmental approvals including, but not limited to, zoning approvals, building permits, and any applicable environmental approvals including copies of the same; (3) a copy of the plans and specifications that have been approved by Licensor for the proposed equipment installation; (4) evidence that any contractors, other than Licensor, that will be performing the Work are on Licensor's approved vendor list, with valid and current worker's compensation and general liability insurance certificates on file with Licensor naming Licensor as an additional insured and which otherwise satisfy the insurance coverage requirements set forth in section 16(d) of this Agreement;  and (5) a construction schedule.  In no event will a NTP be issued prior to the payment by Licensee of a Relocation Application Fee when required pursuant to section 10(c) of this Agreement.  Notwithstanding anything to the contrary in this Agreement, Licensor reserves the right, in its sole discretion, to refuse to permit any person or company to climb the Tower.

b) **Structural Analysis/Interference Analysis.** Prior to the commencement of any Work on the Tower Facility by or for the benefit of Licensee, Licensor may, in its reasonable discretion, perform or cause to be performed a structural analysis or require a professional engineer's certified letter to determine the availability of capacity at the Tower Facility for the installation or modification of any Approved Equipment and/or additional equipment at the Licensed Space by Licensee. Licensee agrees to remit payment to Licensor for all reasonable costs and expenses incurred by Licensor for such structural analysis or professional engineer's certified letter ("Structural Analysis Fee") within 30 days following receipt of an invoice from Licensor. The foregoing charge shall be at Licensor's prevailing rates for the performance of same or the amount Licensor's vendor is then charging Licensor, as applicable. In the event a structural analysis is performed after the execution of this Agreement but prior to the initial installation of the Approved Equipment, and such analysis indicates that the existing Tower cannot accommodate the proposed installation of Licensee's Approved Equipment thereon, Licensor shall notify Licensee that modification of the Tower is required and inform Licensee of the fee Licensor will charge Licensee to complete such modification (which fee shall be a reasonable estimate of Licensor's actual cost of making such modifications). Such modification shall become part of the Tower Facility and Be Licensor's sole property.  If Licensee elects not to pay such fee, and Licensee and Licensor do not otherwise reach an agreement regarding the costs of such modification, License Licensee may terminate this Agreement upon written notice to Licensor.  Prior to the commencement of any initial or subsequent construction or installation on the Tower Facility by or for the benefit of Licensee and/or the modification of Licensee's Permitted Frequencies propagated from the Licensed Space, Licensor may elect to perform a shared site interference study ("SSIS") and Licensee shall pay Licensor a fee of $1,600.00 per study ("SSIS Fee"), as adjusted annually on the anniversary of the Commencement Date by a percentage rate equal to the Annual Escalator.  This fee shall be payable at the time Licensee pays the Relocation Application Fee where required pursuant to section 10(c) of this Agreement, or immediately upon receipt of notice from Licensor that Licensor has determined that a SSIS is required.  In the event a SSIS is performed after the execution of this Agreement by Licensor but prior to the installation of Licensee's Approved Equipment, and such SSIS indicates that the proposed installation of Licensee's Approved Equipment on the Tower is acceptable, such an indication in no way relieves Licensee of its obligations under section 11 herein.

c) **Equipment; Relocation, Modification, Removal.**  Licensor hereby grants Licensee reasonable access to the Licensed Space for the purpose of installing and maintaining the Approved Equipment and its appurtenances. Except as otherwise provided, Licensee shall be responsible for all site Work to be done on the Licensed Space or the Easement pursuant to this Agreement.  Licensee shall provide all materials and shall pay for all labor for the construction, installation, operation, maintenance and repair of the Approved Equipment. Licensee shall not construct, install or operate any equipment or improvements on the Tower Facility other than those which are described on Exhibit A, alter the Permitted Frequencies, or alter the operation of the Approved Equipment. Licensee shall submit an Application, utilizing Licensor's then current form, to request the right to replace or modify its Approved Equipment, alter the Permitted Frequencies or increase the Ground Space, which Application shall be accompanied by a Relocation Application Fee.  Licensor shall evaluate for approval the feasibility of Licensee's request, which approval shall be in Licensor's sole discretion.  Licensee acknowledges that any such relocation or modification of the Approved Equipment may result in an increase in the Annual License Fee. An amendment to this Agreement shall be prepared to reflect each addition or modification to Licensee's Approved Equipment to which Licensor has given its written consent and the resulting increase in the Annual License Fee, if any. Licensee shall have the right to remove all Approved Equipment at Licensee's sole expense on or before the expiration or earlier termination of the License provided Licensee repairs any damage to the Tower Facility or the Tower caused by such removal. Within 30 days of the expiration or termination of this Agreement for any reason, Licensee shall: (i) remove the Approved Equipment and any other property of Licensee at the Tower Facility at Licensee's sole risk, cost, and expense; (ii) deliver the Licensed Space in substantially the same and in as good a condition as received (ordinary wear and tear excepted); and (iii) repair any damage caused by the removal of the Approved Equipment within 10 days of the occurrence of such damage. If Licensee fails to timely pay the Holdover Fee or does not remove its Approved Equipment within 30 days after the expiration or termination of this Agreement, (i) the Approved Equipment shall be deemed conclusively and absolutely abandoned by Licensee and anyone claiming by, through, or under Licensee except for Hazardous Materials and waste and Approved Equipment containing Hazardous Materials and waste; and (ii) Licensor shall have the right to remove the Approved Equipment at

Licensee's sole expense and dispose of such Approved Equipment in any manner Licensor so elects, and Licensee shall reimburse Licensor for its expenses upon demand without off-set.

11. **RF INTERFERENCE/ USER PRIORITY.**
   a) **Definitions.** For purposes of this section 11, the following capitalized terms shall have the meanings set forth herein:

   i.   **Interference** includes any performance degradation, misinterpretation, or loss of information to a radio communications system caused by unwanted energy emissions, radiations, or inductions, but shall not include permissible interference as defined by the FCC, and in addition, with regard to Unlicensed Frequencies, congestion.

   ii.  **Licensed Frequencies** are those certain channels or frequencies of the radio frequency spectrum that are licensed by the FCC in the geographic area where the Tower Facility is located.

   iii. A **Licensed User** is any user of the Tower Facility, including Licensee, which transmits and/or receives Licensed Frequencies at the Tower Facility, but only with respect to such Licensed Frequencies.

   iv.  A **Priority User** is any Licensed User of the Tower Facility that holds a priority position in relationship to Licensee for protection from Interference, as determined in this section 11, which status is subject to change as set forth herein.

   v.   A **Subsequent User** is any user of the Tower Facility that holds a subordinate position in relationship to Licensee for protection from Interference, as determined in this section 11, which status is subject to change as set forth herein.

   vi.  **Unlicensed Frequencies** are those certain channels or frequencies of the radio frequency spectrum that are not licensed by the FCC and are available for use by the general public in the geographic area where the Tower Facility is located.

   vii. An **Unlicensed User** is any user of the Tower Facility, including Licensee, which transmits and/or receives Unlicensed Frequencies at the Tower Facility, but only with respect to such Unlicensed Frequencies.

   b) **Information.** Licensee shall cooperate with Licensor and with other lessees, licensees or occupants of the Tower Facility for purposes of avoiding Interference and/or investigating claims of Interference. Upon request, Licensee, within 10 days of Licensor's request, shall provide Licensor with a list of Licensee's transmit and receive frequencies and Approved Equipment specifications necessary to resolve or investigate claims of Interference.

   c) **Unlicensed Frequencies.** Notwithstanding any other provision contained herein, as among Licensor, Licensee and other users of the Tower or Tower Facility, (i) an Unlicensed User shall have no priority with respect to any other FCC Unlicensed Users with respect to Interference; and (ii) an Unlicensed User's rights and obligations with respect to such Interference shall be determined and governed by FCC Rules and Regulations and any other Applicable Law. Licensor expressly disclaims any and all warranties and accepts no responsibility for management, mediation, mitigation or resolution of Interference among FCC Unlicensed Users operating at the Tower Facility and shall have no liability therefor.

   d) **Licensed Frequencies.** Subject to FCC Rules and Regulations and other Applicable Law, the Parties acknowledge and agree that the accepted industry standard for priority protection from Interference between multiple Licensed Users has been based on the priority of occupancy of each user to another user of the Tower or Tower Facility, which priority has been based on the order of submittal of its collocation Application by each user of the Tower or Tower Facility. Should Application of FCC Rules and Regulations and other Applicable Law not resolve any claims of Interference consistent with subsections 11(e), 11(f) and 11(g) below, as among Licensor, Licensee and other users of the Tower Facility, (i) each Licensed User's priority shall be maintained so long as the Licensed User does not change the equipment and/or frequency that it is entitled to use at the Tower Facility at the time of its initial occupancy; and (ii) Licensee acknowledges and agrees that if Licensee replaces its Approved Equipment or alters the radio frequency of the Approved Equipment to a frequency range other than as described on page 1 of this Agreement, Licensee will lose its priority position for protection from Interference with regard to Approved Equipment operating at the new frequency in its relationship to other Licensed Users which are in place as of the date Licensee replaces its Approved Equipment or alters its radio frequency, consistent with this section 11.

   e) Correction.
      i.   <u>Licensee.</u> Licensee agrees not to cause Interference with the operations of any other user of the Tower or Tower Facility and to comply with all other terms and provisions of this section 11 imposed upon Licensee. If Licensor determines, in its reasonable discretion based on standard and accepted engineering practices,

that Licensee's Approved Equipment is causing Interference to the installations of Licensor or a Priority User, Licensee shall, within 48 hours of notification from Licensor, commence such actions as are necessary to mitigate or eliminate the Interference, with the exception of ceasing Licensee's operations. If Licensee cannot mitigate or eliminate such Interference within the 48 hour period, Licensor may file a complaint with the FCC (currently the FCC's Enforcement Bureau, Spectrum Enforcement Division) or if such other user of the Tower Facility which is subject to Interference from Licensee's Approved Equipment is a Priority User, then upon the request of such Priority User consistent with Licensor's contractual obligations owed to the Priority User, Licensor may require that Licensee turn off or power down its interfering Approved Equipment and only power up or use such Approved Equipment during off-peak hours specified by Licensor in order to test whether such Interference continues or has been satisfactorily eliminated.  If Licensee is unable to resolve or eliminate, to the satisfaction of Licensor, such Interference within 30 days from Licensee's initial notification thereof, Licensee will immediately remove or cease operations of the interfering Approved Equipment.

    ii.    <u>Licensor</u>.  Upon the request of Licensee, Licensor hereby covenants to take commercially reasonable efforts to prohibit a Subsequent User from causing Interference with the operations of Licensee to the extent Licensee is a Priority User pursuant this section 11.  If Licensor determines, in its reasonable discretion based on standard and accepted engineering practices, that a Subsequent User's equipment is causing Interference to the installations of Licensee, upon Licensee's request, Licensor shall, within 48 hours of request, commence such actions as are necessary to mitigate or eliminate the Interference, with the exception of ceasing Subsequent User's operations.

    iii.    <u>Government Users</u>.  Notwithstanding the foregoing, if another user of the Tower or Tower Facility is a governmental entity, Licensor shall give such governmental entity written notice of the Interference within 5 Business Days of Licensor's determination that such action is reasonably necessary.  Licensor shall have the right to give the governmental entity 5 Business Days, or more as specified in the governmental site or occupancy agreement or as required by Applicable Law, from the receipt of such notice prior to Licensor being required to take any actions required by this subsection 11 (e) to cure such Interference.

f)    **FCC Requirements Regarding Interference**.  Nothing herein shall prejudice, limit or impair Licensee's rights under Applicable Law, including, but not limited to, FCC Rules and Regulations to redress any Interference independently of the terms of this section 11.  Notwithstanding anything herein to the contrary, the provisions set forth in this section 11 shall be interpreted in a manner so as not to be inconsistent with Applicable Law, including, but not limited to, FCC Rules and Regulations and nothing herein relieves Licensee from complying with all Applicable Laws governing the propagation of radio frequencies and/or radio frequency interference.  The Parties acknowledge that currently FCC Rules and Regulations govern the obligations of wireless telecommunication service providers with respect to the operation of equipment and use of frequencies.  Consequently, the provisions set forth in this section 11 are expressly subject to CFR, Title 47, including but not limited to Part 15, et seq, governing Radio Frequency Devices; Part 20, et seq, governing commercial mobile radio services; Part 24, et seq, governing personal communications services; and Part 90, et seq, governing private land mobile radio services.  In addition, in accordance with good engineering practice and standard industry protocols, licensees employ a wide range of techniques and practices, including those involving the use of proper types of equipment as well those related to the adjustment of operating parameters, in a mutually cooperative effort to identify and mitigate sources of Interference.  The obligation of Part 20 licensees, including, but not limited to, private paging, specialized mobile radio services, cellular radiotelephone service and personal communications services, to avoid Interference is set forth in 47 CFR Part 90, Subpart N – Operating Requirements, §90.403(e).  Claims of Interference are ultimately cognizable before the FCC's Enforcement Bureau, Spectrum Enforcement Division.  Licensee shall observe good engineering practice and standard industry protocols, applying such commercially reasonable techniques as constitute best practices among licensees, in the deployment of their frequencies and the operation of the Approved Equipment.  If Licensee deploys its frequencies or operates the Approved Equipment in a manner which prevents any other user of the Tower or Tower Facility from decoding signal imbedded in their licensed frequencies such that the Spectrum Enforcement Division makes a determination that Licensee is the cause of the Interference and Licensee fails or refuses to mitigate or eliminate the Interference within the time and manner proscribed by the Spectrum Enforcement Division, Licensee shall be default of this Agreement and the remedies set forth in section 22 shall apply.

g)    **Public Safety Interference.**  As of the Commencement Date, Licensor and Licensee are aware of the publication of FCC Final Rule, Private Land Mobile Services; 800 MHz Public Safety Interference Proceeding, *Federal Register*: November 22, 2004 (Volume 69, Number 224), Rules and Regulations, Page 67823-67853 ("Final Rule"). Claims of Interference made by or against users which are public safety entities shall be in compliance with the Final Rule as and when effective, or otherwise in accordance with FCC Rules and Regulations.

h)    **AM Detuning.** The parties acknowledge that the FCC Rules and Regulations govern the obligations of Licensee with respect to the operation of the Approved Equipment.  Consequently, the provisions set forth in this Agreement are expressly subject to the FCC Rules and Regulations, including, but not limited to 47 C.F.R. §§ 27.63, 22.371 and 73.1692. Licensee agrees, at Licensee's sole cost, to comply with the foregoing as well as any and all other

FCC Rules, Regulations and public guidance relating to AM detuning as such provisions currently exist or are hereafter modified. Licensee shall be fully responsible for any pre and/or post installation testing for AM interference at the Tower Facility and for the installation of any new detuning apparatus or the adjustment of any existing detuning apparatus that may be necessary to prevent adverse effects on the radiation pattern of any AM station caused by the installation of the Approved Equipment. Licensee shall provide Licensor with written proof of such compliance. In the event that Licensee determines that pre or post-installation testing for AM interference is not required at the Tower Facility, such a determination shall be at Licensee's sole risk.  If Licensee or Licensor receives a complaint of interference from an AM broadcast station after the Approved Equipment is added to a Tower or a Tower is modified to accommodate Licensee, Licensee shall eliminate such interference within 30 calendar days of the receipt of such complaint. Licensee's failure to eliminate such interference within such 30 day period shall constitute a default under this Agreement and Licensor shall have the right to eliminate such interference at Licensee's expense.  Licensee further agrees to indemnify Licensor in the event that Licensee's failure to comply with the FCC Rules and Regulations prior to installation/modification of the Approved Equipment results in any administrative investigation, proceeding or adjudication with respect to Licensor.

12. **SITE RULES AND REGULATIONS.**  Licensee agrees to comply with the reasonable rules and regulations established from time to time at the Tower Facility by Licensor, which may be modified by Licensor from time to time upon receipt by Licensee of such revised rules and regulations. Such rules and regulations will not unreasonably interfere with Licensee's use of the Licensed Space under this Agreement.

13. **POWERING DOWN.**

   a) **Non-emergency.** Licensor may require that Licensee temporarily discontinue operation or reduce power of its Approved Equipment in order for Licensor or another user at the Tower Facility to install equipment, to modify the Tower or another portion of the Property or equipment located on the Property, or to conduct maintenance or perform repairs.  Upon prior written consent of Licensor, another user shall have the right to require that Licensee temporarily discontinue operations or reduce power of its Approved Equipment to the extent reasonably necessary to accomplish the aforesaid objectives.  If such discontinuance of operation or reduction of power is required for non-emergency work, Licensor shall provide 10 days' prior written notice to Licensee that such discontinuance or reduction must occur.  Licensor and Licensee shall act in good faith to arrange a convenient date and time for Licensor or the other user, as applicable, to cause such a discontinuance or reduction by Licensee.  If such an arrangement cannot be reached, Licensor shall have the unilateral right to schedule the required work and the required discontinuance or reduction based on its good faith assessment of the respective needs of Licensor and all users.

   b) **Emergency.**  In an emergency (an event resulting in or likely to result in injury to persons or property), Licensor may require Licensee, to cease operating, reduce or turn off electrical power, reduce its signal strength, or make other adjustments to its operation upon such notice as may be reasonably practical under the circumstances. In the event the Licensee fails or refuses to discontinue or reduce power due to emergency circumstances as requested by Licensor, or the circumstances dictate that no notice may be given, Licensor may, without liability to Licensee, at its sole and absolute discretion discontinue electric service to Licensee's transmitter and equipment until such repairs are complete.  Licensor shall restore such electrical service as soon as reasonably practical.

14. **DESTRUCTION; CONDEMNATION.**

   a) **Destruction.** If the Tower or other portions of the improvements at the Tower Facility owned by Licensor are destroyed or so damaged as to materially interfere with Licensee's use and benefits from the Licensed Space, Licensor or Licensee shall be entitled to elect to cancel and terminate this Agreement on the date of such casualty and any unearned Annual License Fee paid in advance of such date shall be refunded by Licensor to Licensee within 30 days of such termination date.  Notwithstanding the foregoing, Licensor may elect, in its sole discretion, to restore the damaged improvements, in which case Licensee and Licensor shall remain bound to the terms of this Agreement but Licensee shall be entitled to an abatement of the Annual License Fee during the loss of use.  If the Tower is so damaged that reconstruction or repair cannot reasonably be undertaken without removing the Approved Equipment, then (i) Licensor may, upon giving written notice to Licensee, remove any of the Approved Equipment and interrupt the signal activity of Licensee, (ii) Licensee may, at Licensee's sole cost and expense, install temporary facilities pending such reconstruction or repair, provided such temporary facilities do not interfere with the construction, rebuilding or operation of the Tower, (iii) Licensor agrees to provide Licensee alternative space, if available, on the Tower or at the Tower Facility during such reconstruction/repair period and (iv) should Licensor not substantially restore or replace the Tower in a fashion sufficient to allow Licensee to resume operations thereon within 6 months of the date of casualty, provided that such 6 month period shall be automatically extended for so long as Licensor has commenced and diligently continues to restore or replace such Tower, and Licensee's operation has been materially disrupted for 60 or more consecutive days, then Licensee, upon 30 days' prior written notice to Licensor, may terminate this Agreement.

#11552v4

b) **Condemnation**.  If the whole or any substantial part of the Tower Facility shall be taken by any public authority under the power of eminent domain or in deed or conveyance in lieu of condemnation so as to materially interfere with Licensee's use thereof and benefits from the Licensed Space, then this Agreement shall terminate on the part so taken on the date of possession by such authority of that part, and Licensor or Licensee shall have the right to terminate this Agreement and any unearned Annual License Fee paid in advance of such termination shall be refunded by Licensor to Licensee within 30 days following such termination.  Notwithstanding the foregoing, Licensor may elect to rebuild the Tower or other improvements affected by such condemnation at an alternate location or property owned, leased or managed by Licensor, in which case Licensee and Licensor shall remain bound hereby.  Upon such relocation of the Tower or improvements, the Licensed Space shall be modified to include the new Tower or improvements and the property on which the same are located and this Agreement shall be amended accordingly to clarify the rights of Licensor and Licensee with respect to the Licensed Space. Licensee agrees not to make a claim to the condemning authority for any condemnation award to the extent such claim shall diminish or affect the award made to Licensor with regard to such condemnation.

c) **License Fee Abatement**.  The Annual License Fee with respect to the affected Tower Facility shall be abated during any period that the Tower has not been restored following an event described in subsections (a) or (b) above so long as Licensee is unable to continue to operate from a temporary location at the property during any period of restoration.

15. **COMPLIANCE WITH LAWS.**  Licensor shall be responsible for compliance with any marking and lighting requirements of the FAA and the FCC applicable to the Tower Facility, provided that if the requirement for compliance results from the presence of the Approved Equipment on the Tower, Licensee shall pay the costs and expenses therefor (including any lighting automated alarm system so required).  Licensee has the responsibility of carrying out the terms of Licensee's FCC license with respect to tower light observation and notification to the FAA if those requirements imposed on Licensee are in excess of those required of Licensor.  Notwithstanding anything to the contrary in this Agreement, Licensee shall at all times comply with all Applicable Laws and ordinances and all rules and regulations of municipal, state and federal governmental authorities relating to the installation, maintenance, location, use, operation, and removal of the Approved Equipment and other alterations or improvements authorized pursuant to the provisions of this Agreement.

16. **INDEMNIFICATION; INSURANCE.**

a) **Mutual Indemnity**.  Subject to the mutual waiver of subrogation set forth in section 28, Licensee and Licensor each indemnifies the other against and holds the other harmless from any and all costs, demands, Damages, suits, expenses, or causes of action (including reasonable attorneys fees and court costs) which arise out of the use and/or occupancy of the Licensed Space by the Indemnifying Party.  This indemnity does not apply to any Claims arising from the gross negligence or intentional misconduct of the Indemnified Party.

b) **Limits on Indemnification**.  Neither Party shall be responsible or liable to any of the foregoing Indemnified Parties for any Damages arising from any claim to the extent attributable to any acts or omissions of other licensees or users occupying the Tower Facility or for any structural or power failures or destruction or damage to the Tower Facility except to the extent caused by the sole, joint, or concurrent gross negligence or willful misconduct of such Party.

c) **Survival.**  The provisions of this section 16 shall survive the expiration or earlier termination of this Agreement with respect to any events occurring on or before expiration or termination of same whether or not Claims relating thereto are asserted before or after such expiration or termination.

d) **Insurance**.  Licensor and Licensee shall keep in full force and effect, during the Term of this Agreement, insurance coverage in accordance with Appendix II attached hereto.

17. **LIMITATION OF PARTIES' LIABILITY.**  NEITHER LICENSOR NOR LICENSEE SHALL BE RESPONSIBLE FOR, AND HEREBY WAIVES ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES INCURRED RESULTING FROM (i) LICENSEE'S USE OR LICENSEE'S INABILITY TO USE THE TOWER FACILITY, OR (ii) DAMAGE TO THE OTHER'S EQUIPMENT.  If Licensor shall fail to perform or observe any term, condition, covenant or obligation required to be performed or observed by it under this Agreement or is charged with an indemnity obligation hereunder, and if Licensee shall, as a consequence thereof, recover a money judgment against Licensor (whether compensatory or punitive in nature), Licensee agrees that it shall look solely to Licensor's right, title and interest in and to the Tower Facility and the Tower for the collection of such judgment, and Licensee further agrees that no other assets of Licensor shall be subject to levy, execution or other process for the satisfaction of Licensee's judgment, and that Licensor shall not be personally liable for any deficiency.

18. **DISCLAIMER OF WARRANTY. LICENSOR HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ASSOCIATED WITH THE TOWER FACILITY**

**OR THE TOWER.   LICENSEE HEREBY ACCEPTS THE TOWER FACILITY "AS IS, WHERE IS, WITH ALL FAULTS."**

19.   NOTICES.  All notices, demands, approvals, requests and other communications shall be in writing to such Party at the address listed in the introductory paragraph of this Agreement (and in each case, in the event of notice to Licensor, with a copy of such notice to American Towers, Inc., 116 Huntington Avenue, Boston, MA 02116, Attention: General Counsel) or at such other address as such Party shall designate by notice to the other party hereto in accordance with this section 19 (the "Notice Address") and may be personally delivered; mailed, via United States certified mail, return receipt requested; or transmitted by overnight courier for next Business Day delivery, and, if not delivered personally, shall be deemed to be duly given or made 2 Business Days after deposit with the applicable carrier or courier.  Notices will be deemed to have been given upon either receipt or rejection.  Notwithstanding the foregoing, (i) any notice that is given by a party may be given by the attorneys for that party and shall be deemed effective for all purposes herein, and (iii) only notices, letters, documents, or instruments threatening to declare or declaring such addressee or recipient in default under this Agreement shall be required to be sent to the attorneys representing such addressee or recipient, if the name and address of such attorney is provided for herein.

20.  **ASSIGNMENT; SUBLEASING.**  Licensee may not assign this Agreement as a whole, or any portion of Licensee's rights, title and interests hereunder without Licensor's prior written consent; *provided, however,* that Licensor's consent will not be required for an assignment to (i) any person or entity which is directly or indirectly (through one or more subsidiaries) controlled by, controlling or under common control with Licensee, (ii) is the successor or surviving entity by a merger or consolidation of such entity pursuant to Applicable Law, or (iii) purchases substantially all the assets of Licensee (collectively, "Permitted Affiliate"). For the purpose of this section 20, "control" means ownership, directly or indirectly, of 50% or more of the voting stock, equity or beneficial interest or a general partner of any partnership, and the ability to effectively control or direct the business of Licensee. In no event may Licensee sublet, sublease, or permit any use of the Tower Facility or Licensed Space by any other party. Any permitted assignee shall expressly assume, and become bound by, all of Licensee's obligations under this Agreement.  Licensor may freely assign, transfer, or sublease this Agreement and, in such event, Licensee shall be relieved of all of its obligations under this Agreement from and after the date of such assignment or transfer. Licensee shall pay Licensor a fee of $500.00 (which fee shall increase annually on each anniversary of the Commencement Date by a percentage rate increase equal to the Annual Escalator) in each instance in which Licensee requests Licensor to consent to an assignment of this Agreement or in which Licensee seeks an estoppel certificate, nondisturbance agreement, subordination agreement or other similar agreement to defray the administrative cost incurred by Licensor to process such requests, prepare and process any necessary documentation, and modify its database and other information systems to reflect any such agreement. Such fee is due upon submission of Licensor's request and is hereby deemed fully earned by Licensor upon receipt. Notwithstanding anything to the contrary, Licensor may condition its consent to any assignment, on among other things, (i) requiring that the assignee execute a new form of license agreement so long as the Annual License Fee and Initial and Renewal Terms of such agreement are consistent with those set forth in this Agreement, and (ii) requiring the assignee to demonstrate that it maintains at the time of such assignment, as evidenced by current financial statements provided to Licensor, a financial position reasonably demonstrating the ability of such assignee to meet and perform the obligations of Licensee hereunder through the unexpired balance of the then current Initial Term or Renewal Term. Any purported assignment by Licensee in violation of the terms of this Agreement shall be void. This Agreement shall be binding upon the successors and permitted assigns of both Parties.

21.  **SUBORDINATION TO GROUND LEASE.**  The Parties acknowledge and agree that in the event Licensor's rights in the Licensed Space and/or any part of the Tower Facility is derived in whole or part pursuant to an underlying lease, sublease, permit, easement or other right of use agreement (a "Ground Lease"), all terms, conditions and covenants contained in this Agreement shall be specifically subject to and subordinate to the terms and conditions of the applicable Ground Lease.  In the event that any of the provisions of the Ground Lease are in conflict with any of the provisions of this Agreement (other than those provisions relating to the length of term, termination rights or financial consideration), the terms of the Ground Lease shall control. Further, Licensee agrees to comply with the terms of such Ground Lease as applicable to the access and occupancy of the Licensed Space.  Notwithstanding anything contained in this Agreement to the contrary, if the Ground Lease expires or is terminated for any reason, this Agreement shall terminate on the effective date of such termination and Licensor shall have no liability to Licensee as a result of the termination of this Agreement.  Licensor is under no obligation to extend the term of or renew the Ground Lease.  Licensor shall give Licensee written notice of such termination or expiration of this Agreement as a result of the termination or expiration of the Ground Lease as soon as practicable.  Unless prohibited by the terms of such Ground Lease, upon Licensee's written request, Licensor shall provide a copy of any applicable Ground Lease with the economic terms and other terms that Licensor deems reasonably confidential redacted.

22.  **DEFAULT.**  The occurrence of any of the following instances shall be considered to be a default or a breach of this Agreement by Licensee: (i) any failure of Licensee to pay the Annual License Fee, or any other charge for which Licensee has the responsibility of payment under this Agreement, within 10 Business Days of the date following written notice to Licensee from Licensor, or its designee, of such delinquency, it being understood, however, that Licensor is obligated to provide such notice only two times in each calendar year, and the third instance of the failure to pay the Annual License Fee or any other charge shall be an immediate default without notice to Licensee if not paid within 10

Business Days of the date when due; (ii) any failure of Licensee to perform or observe any term, covenant, provision or condition of this Agreement which failure is not corrected or cured by Licensee within 30 days of receipt by Licensee of written notice from Licensor, or its designee, of the existence of such a default; except such 30 day cure period shall be extended as reasonably necessary to permit Licensee to complete a cure so long as Licensee commences the cure within such 30 day cure period and thereafter continuously and diligently pursues and completes such cure; (iii) failure of Licensee to abide by the Interference provisions as set forth in section 11; (iv) Licensee shall become bankrupt, insolvent or file a voluntary petition in bankruptcy, have an involuntary petition in bankruptcy filed against Licensee which cannot be or is not dismissed by Licensee within 60 days of the date of the filing of the involuntary petition, file for reorganization or arrange for the appointment of a receiver or trustee in bankruptcy or reorganization of all or a substantial portion of Licensee's assets, or Licensee makes an assignment for such purposes for the benefit of creditors; (v) this Agreement or Licensee's interest herein or Licensee's interest in the Tower Facility are executed upon or attached; (vi) Licensee commits or fails to perform an act which results in a default under or nonconformance with the Ground Lease by Licensor and the same shall not be cured within 5 Business Days (or such shorter time as permitted under the Ground Lease to cure) of the date following written notice to Licensee from Licensor, or its designee, of such default; or (vii) the imposition of any lien on the Approved Equipment except as may be expressly authorized by this License, or an attempt by Licensee or anyone claiming through Licensee to encumber Licensor's interest in the Tower Facility, and the same shall not be dismissed or otherwise removed within 10 Business Days of written notice from Licensor to Licensee.

23. **REMEDIES**. In the event of a default or a breach of this Agreement by Licensee and after Licensee's failure to cure the same within the time allowed Licensee to cure such default, if applicable, then Licensor may, in addition to all other rights or remedies Licensor may have hereunder at law or in equity, (i) terminate this Agreement by giving written notice to Licensee, stating the date upon which such termination shall be effective, accelerating and declaring to be immediately due and payable the then present value of all Annual License Fees and other charges or fees which would have otherwise been due Licensor absent a breach of the Agreement by Licensee, discounted by an annual percentage rate equal to 5%, (ii) terminate electrical power to the Approved Equipment, and/or (iii) remove the Approved Equipment without being deemed liable for trespass or conversion and store the same at Licensee's sole cost and expense for a period of 30 days after which the Approved Equipment, other than Hazardous Materials, will be deemed conclusively abandoned if not claimed by Licensee.  Licensee shall pay all reasonable attorney's fees, court costs, removal and storage fees (including any damage caused thereby), and other items of cost reasonably incurred by Licensor in recovering the Annual License Fee or other fee or charge. Licensee shall not be permitted to claim the Approved Equipment until Licensor has been reimbursed for removal and storage fees. Past due amounts under this Agreement will bear interest from the date upon which the past due amount was due until the date paid at a rate equal to 18% per annum, or at a lower rate if required by law in the state in which this Agreement is to be performed.  In addition, Licensee shall be assessed a late payment fee equal to 25% of the then-current Annual License Fee for any payment or reimbursement due to Licensor under this Agreement which is overdue by ten (10) days or more and such fee shall be assessed for each 30 day period thereafter that any such amount (or portion thereof) remains unpaid.

24. **GOVERNMENTAL APPROVALS; PERMITS**.  In the event that any governmental permit, approval or authorization required for Licensor's use of, operation of, or right to license space to Licensee at the Tower Facility is terminated or withdrawn by any governmental authority or third party as part of any governmental, regulatory, or legal proceeding, Licensor may terminate this Agreement.  Licensee hereby agrees that in the event of a governmental or legal order requiring the removal of the Approved Equipment from the Tower, the modification of the Tower, or the removal of the Tower, Licensee shall remove the Approved Equipment promptly, but in no event later than the date required by such order, at Licensee's sole cost and expense.  Licensor shall cooperate with Licensee in Licensee's efforts to obtain any permits or other approvals that may be necessary for Licensee's installation and operation of the Approved Equipment, provided that Licensor shall not be required to expend any funds or undertake any liability or obligation in connection with such cooperation. Licensor may elect to obtain such required approvals or permits on Licensee's behalf, at Licensee's sole cost and expense. In no event may Licensee encourage, suggest, participate in or permit the imposition of any restrictions or additional obligations whatsoever on the Tower Facility or Licensor's current or future use or ability to license space at the Tower Facility as part of or in exchange for obtaining any such approval or permit.  In the event that Licensee's shelter or cabinets are installed above a third-party or Licensor-owned shelter or building, Licensee shall be solely responsible for obtaining any required approvals, or permits in connection with such shelter or cabinet installation, excepting the consent of other users at the Tower Facility and/or the ground landlord which shall remain the sole responsibility of Licensor where required.

25. **REPLACEMENT OF TOWER/RELOCATION OF APPROVED EQUIPMENT**.

   a) **Replacement of Tower**. Licensor may, at its election, replace or rebuild the Tower or a portion thereof. Such replacement will (i) be at Licensor's sole cost and (ii) not result in an interruption of Licensee's communications services beyond that which is necessary to replace the new Tower. If Licensee, in Licensee's reasonable discretion, cannot operate the Approved Equipment from the existing Tower during such replacement or rebuild of the Tower, Licensee may establish, at Licensee's sole cost, a temporary facility on the Tower Facility to provide such services as Licensee deems necessary during any such construction by Licensor so long as adequate space is then available. The location of such temporary facilities shall be subject to Licensor's approval. The License Fee due

hereunder shall be abated for any period during which Licensee is prevented from broadcasting from the existing Tower due to such replacement or relocation. At the request of either Party, Licensor and Licensee shall enter into an amendment to this Agreement to clarify the rights of Licensor and Licensee to the new Tower Facility.

b) **Tower Removal**: If during the term of this Agreement Licensor determines based on engineering structural standards generally applied to communications towers that the Tower is or has become structurally unsound such that pursuant to generally accepted industry safety standards the Tower or a portion thereof must be removed, then, upon 90 days prior written notice to Licensee, Licensor may, in its sole discretion either (i) remove the Tower and terminate this Agreement effective as of the date of such removal, or (ii) modify the Tower and relocate Licensee's Approved Equipment to an alternative location on the modified Tower. If Licensee and Licensor are not able to agree on an alternative location on the modified Tower for the installation of Licensee's Approved Equipment within the foregoing 90 day notice period, then Licensee or Licensor may elect to terminate the Agreement.

26. **EMMISIONS**. If antenna power output ("RF Emissions") is presently or hereafter becomes subject to any restrictions imposed by the FCC or other governmental agency for RF Emissions standards on Maximum Permissible Exposure ("MPE") limits, or if the Tower Facility otherwise becomes subject to federal, state or local rules, regulations, restrictions or ordinances, Licensee shall comply with Licensor's reasonable requests for modifications to the Approved Equipment which are reasonably necessary for Licensor to comply with such limits, rules, regulations, restrictions or ordinances and Licensor shall use commercially reasonable efforts to cause all other licensees of the Tower Facility to promptly comply. If Licensor requires an engineering evaluation or other power density study be performed to evaluate RF Emissions compliance with MPE limits, then all reasonable costs of such an evaluation or study shall be paid proportionately by Licensee and all other licensees of the Tower within 30 days of Licensor's request therefor. If said study or a study sponsored by any governmental agency indicates that RF Emissions at the Tower Facility do not comply with MPE limits, then Licensee and Licensor, each for itself, shall immediately take any and all steps necessary to ensure that it is individually in compliance with such limits, up to and including cessation of operation, until a maintenance program or other mitigating measures can be implemented to comply with MPE and in addition, Licensor shall use commercially reasonable efforts to cause all other licensees of the Tower to take similar steps necessary to ensure that they are individually in compliance with such limits.

27. **ENVIRONMENTAL**. Licensee covenants that it will not use, store, dispose, or release any Hazardous Substances on the Tower Facility in violation of Applicable Law. Licensee agrees to indemnify and save harmless Licensor against any and all Claims, liabilities, causes of action, Damages, orders, judgments, and clean-up costs arising from Licensee's breach of any the covenants contained in this section 27. The obligations of Licensee to indemnify Licensor pursuant to this section 27 shall survive the termination or expiration of this Agreement.

28. **SUBROGATION.**
   a) **Waiver**. Licensor and Licensee waive all rights against each other and any of their respective consultants and contractors, agents and employees, for Damages caused by perils to the extent covered by the proceeds of the insurance provided herein, except such rights as they may have to the insurance proceeds. All insurance policies required under this Agreement shall contain a waiver of subrogation provision under the terms of which the insurance carrier of a Party waives all of such carrier's rights to proceed against the other Party. Licensee's insurance policies shall provide such waivers of subrogation by endorsement. Licensee shall require by appropriate agreements, written where legally required for validity, similar waivers from its contractors and subcontractors. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

   b) **Mutual Release**. Notwithstanding anything in this Agreement to the contrary, Licensor and Licensee each release the other and its respective affiliates, employees and representatives from any Claims by them or any one claiming through or under them by way of subrogation or otherwise for Damage to any person or to the Tower Facility and to the fixtures, personal property, improvements and alterations in or on the Tower Facility that are caused by or result from risks insured against under any insurance policy carried by each and required by this Agreement, provided that such releases shall be effective only if and to the extent that the same do not diminish or adversely affect the coverage under such insurance policies and only to the extent of the proceeds received from such policy.

29. **GOVERNING LAW**. This Agreement shall be governed by the laws of the state in which the Tower Facility is located, with the exception of its choice of laws provisions. If any provision of this Agreement is found invalid or unenforceable under judicial decree or decision, the remaining provisions of this Agreement shall remain in full force and effect. Any approval, consent, decision, or election to be made or given by a Party may be made or given in such Party's sole judgment and discretion, unless a different standard (such as reasonableness or good faith) is provided for explicitly.

30. **FINANCING AGREEMENT**. Licensee may, upon written notice to Licensor, mortgage or grant a security interest in the Approved Equipment to any such mortgagees or holders of security interests including their successors and assigns. No such security interest shall extend to, affect or encumber in any way the interests or property of Licensor.

31. **MISCELLANEOUS**.  Upon Licensor's written request, Licensee shall promptly furnish Licensor with complete and accurate information in response to any reasonable request by Licensor for information about any of the Approved Equipment or utilities utilized by Licensee at the Tower Facility or any of the channels and frequencies utilized by Licensee thereon.  In the event that this Agreement is executed by Licensor, its Affiliates or any trade name utilized by Licensor or its Affiliates and such signatory does not hold the real Tower Facility or leasehold interest in the affected Tower Facility, the execution of this Agreement shall be deemed to have been properly executed by Licensor or Licensor's Affiliate which properly holds such interest in the affected Tower Facility.  Upon the termination or expiration of this Agreement, Licensee shall immediately upon the request of Licensor deliver a release of any instruments of record evidencing such Agreement. Notwithstanding the expiration or earlier termination of this Agreement, sections 16, 17, 18, and 27 shall survive the expiration or earlier termination of the Agreement.  No waiver of any of the provisions of this Agreement shall constitute a waiver of any other provision herein (whether or not similar), nor shall such waiver constitute a continuing waiver unless expressly agreed to in writing by the affected Party.  This Agreement constitutes the entire agreement of the Parties hereto concerning the subject matter herein and shall supersede all prior offers, negotiations and agreements, whether written or oral.  No revision of the Agreement shall be valid unless made in writing and signed by authorized representatives of both Parties.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute but one instrument.  The Parties agree that a scanned or electronically reproduced copy or image of this Agreement shall be deemed an original and may be introduced or submitted in any action or proceeding as a competent evidence of the execution, terms and existence of this Agreement notwithstanding the failure or inability to produce or tender an original, executed counterpart of this Agreement and without the requirement that the unavailability of such original, executed counterpart of this first be proven.

32. **CONFIDENTIALITY**.  Neither Party shall use the other's name, service mark or trademark in any public announcement or advertisement without the prior written consent of the other Party, which may be withheld in such Party's sole and absolute discretion.

The offer of license expressed in this Agreement shall automatically expire and become void if two unaltered counterparts of this Agreement, executed by Licensee, are not delivered to Licensor within 30 days of the Effective Date.

ATTACHED EXHIBITS:
Exhibit A: List of Approved Equipment and location of the Licensed Space
Exhibit B: Site Drawing indicating the location of Ground Space for Licensee's equipment shelter or space in Licensor's building (as applicable)
Exhibit C: As-Built Drawings or Construction Drawings to be attached within 45 days after Commencement Date in accordance with Section 3
Appendix I: Definitions
Appendix II: Insurance

**Exhibit A**
**List of Approved Equipment and location of the Licensed Space**

| | | Mary Helen Lopez | San Diego |
|---|---|---|---|

## EXHIBIT A

### GROUND SPACE REQUIREMENTS

| PRIMARY CONTINUOUS LEASE AREA DIMENSIONS (LxWxH (ft)) | | 5 x 5 x 5 | Sq ft. | | | |
|---|---|---|---|---|---|---|
| INSIDE ATC SHELTER | X | DIMENSIONS (LxWxH (ft)) | 5 x 5 x 5 | | | |
| CUSTOMER SHELTER | DIMENSIONS (LxWxH (ft)) | N.A | PAD FOR SHELTER | DIMENSIONS (LxW (ft)) | N.A | STOOP | DIMENSIONS (LxW (ft)) | N.A |
| OUTDOOR CABINETS | QUANTITY OF CABINETS | N.A | DIMENSIONS (LxWxH (ft)) | N.A | PAD FOR CABINETS | DIMENSIONS (LxW (ft)) | N.A |

### BACKUP POWER REQUIREMENTS

| GENERATOR NOT REQUIRED? | X | ATC SHARED GENERATOR | SHARED GENERATOR CAPACITY NEEDED (KW) | N.A |
|---|---|---|---|---|
| INSIDE CUSTOMER/ATC SHELTER | | GENERATOR (to be located inside primary leasing area) | GENERATOR (to be located outside primary leasing area) | |

| ADDITIONAL LEASE AREA REQUIRED | N.A | | | | | |
|---|---|---|---|---|---|---|
| MANUFACTURER | N.A | MAKE / MODEL | N.A | CAPACITY (KW) | N.A | FUEL TYPE | N.A |
| PAD FOR GENERATOR | | DIMENSIONS (LxW (ft)) | N.A | | | |
| FUEL TANK | | DIMENSIONS (LxW (ft)) | N.A | TANK SIZE (gal) | N.A | |
| PAD FOR FUEL TANK (if required) | | DIMENSIONS (LxW (ft)) | N.A | | | |

### SECONDARY LEASE AREA REQUIREMENTS

| Will supplementary ground space be needed to accommodate additional equipment? | Y | | N | X |
|---|---|---|---|---|
| IF YES, ADDITIONAL LEASE AREA DIMENSIONS (LxWxH (ft)) | N.A | Sq ft. | N.A | |
| Minimum space required if requested area not available (LxWxH (ft)) | N.A | Sq ft. | | |
| ADDITIONAL EQUIPMENT | N/A | DIMENSIONS (LxWxH (ft)) | N.A | |
| ADDITIONAL EQUIPMENT | N/A | DIMENSIONS (LxWxH (ft)) | N.A | |

### POWER/TELCO REQUIREMENTS

| POWER PROVIDED BY: | UTILITY COMPANY DIRECT | ATC PROVIDED | X | Average monthly power consumption (kw-mths): $50 a month power off-set |
|---|---|---|---|---|
| TELCO INTERCONNECT REQUIREMENTS: | POTS | T1 | MICROWAVE | FIBER OPTIC'S |

### TRANSMITTER SPECIFICATIONS (& RECEIVER for Broadcast Customer ONLY)

| TRANSMITTER/RECEIVER TYPE | Transmitter | N.A | N.A | N.A | N.A |
|---|---|---|---|---|---|
| QTY of TRANSMITTERS/RECEIVERS | 1 | N.A | N.A | N.A | N.A |
| MANUFACTURER | QEI Corp | N.A | N.A | N.A | N.A |
| TYPE & MODEL | SN-10 | N.A | N.A | N.A | N.A |
| TYPE of TECHNOLOGY | FM | N.A | N.A | N.A | N.A |
| TX POWER OUTPUT | 10 KW | N.A | N.A | N.A | N.A |
| *ERP (Watts) | 25 KW | N.A | N.A | N.A | N.A |
| ELECTRIC SERVICE REQ'SRED (Amps/Volts) | 60/220 | N.A | N.A | N.A | N.A |

### ANTENNA EQUIPMENT (REMAINING/PROPOSED) SPECIFICATIONS

| EQUIPMENT TYPE | FM | N.A | N.A | N.A | N.A |
|---|---|---|---|---|---|
| RAD CENTER AGL (ft) | 376' | N.A | N.A | N.A | N.A |
| EQUIPMENT MOUNT HEIGHT (ft) | 390' top - 376' mid - 362' bottom | N.A | N.A | N.A | N.A |
| EQUIPMENT MOUNT TYPE | Stand-Off | N.A | N.A | N.A | N.A |
| EQUIPMENT MANUFACTURER | ERI | N.A | N.A | N.A | N.A |
| EQUIPMENT MODEL # | DCTK | N.A | N.A | N.A | N.A |
| EQUIPMENT DIMENSIONS (HxWxD) (indicate feet or inches) | 27'X3' | N.A | N.A | N.A | N.A |
| EQUIPMENT WEIGHT (per item, in lbs.) | 114.4 | N.A | N.A | N.A | N.A |
| EQUIPMENT QUANTITY | 8 Bay | N.A | N.A | N.A | N.A |
| AZIMUTHS / DIRECTION of RADIATION (degrees) i.e. "0-180-240" | 45 degrees | N.A | N.A | N.A | N.A |
| QTY. in EACH AZIMUTH / SECTOR, i.e. "4-4-4" | 1 | N.A | N.A | N.A | N.A |
| TRANSMIT, RECEIVE or TRANSMIT & RECEIVE | Transmit | N.A | N.A | N.A | N.A |
| TX FREQUENCY | 107.9 | N.A | N.A | N.A | N.A |
| RX FREQUENCY | N.A | N.A | N.A | N.A | N.A |
| Is equipment using unlicensed frequencies? | No | N.A | N.A | N.A | N.A |
| ANTENNA GAIN | 8.6dB | N.A | N.A | N.A | N.A |
| TOTAL # of LINES for equipment in column | 1 | N.A | N.A | N.A | N.A |
| LINE QTY. in EACH AZIMUTH / SECTOR, i.e. "3-3-3" | 1 | N.A | N.A | N.A | N.A |
| LINE TYPE | Hard Line | N.A | N.A | N.A | N.A |
| LINE DIAMETER / SIZE | 1 1/2" | N.A | N.A | N.A | N.A |

**Exhibit B**

**Site Drawing indicating the location of Ground Space for Licensee's equipment shelter or space in Licensor's building (as applicable)**

Licensee shall not commence installation until Licensor has approved in writing said drawing and attached it hereto.





Licensor Site Name / Number: SAN DIEGO, TX / 89206
Licensee Site Name / Number: KXTM  FM107.7 /  N/A

**Exhibit C**
**As Built Drawings or Construction Drawings**

To be attached hereto within 45 days after the Commencement Date.

**Appendix I**
**Defined Terms**

**Affiliate(s):**  Any corporation, partnership, limited liability company or other entity that (i) is controlled directly or indirectly (through one or more subsidiaries) by Licensee , or (ii) is the successor or surviving entity by a merger or consolidation of Licensee pursuant to Applicable Law, (iii) purchases all or substantially all of the assets of Licensee.  For purposes of this definition, "*control*" means the possession of the right through the ownership of 50% or more of the shares with voting rights to effectively direct the business decisions of the subject entity.

**Agreement**: defined in the introductory paragraph.

**Annual Escalator**: defined in section IV on page 1.

**Annual License Fee**:  defined in subsection 5(a).

**Applicable Law:**  All applicable statutes, ordinances, laws, regulations and directives of any federal, state or local governmental unit, authority or agency having jurisdiction over a Licensed Space or affecting the rights and obligations of Licensor or Licensee under this Agreement, including without limitation, the Communications Act of 1934, as amended from time to time, FCC Rules and Regulations, and the rules, regulations and written policies and decisions of the FAA.

**Application:**  defined in section IV on page 1.

**Application Fee:**  defined in section IV on page 1.

**Approved Equipment:**  the communications system, including antennas, radio equipment, cabling and conduits, shelter and/or cabinets and other personal property owned or operated by Licensee at the Licensed Space, as defined in Exhibit A or B to this Agreement.

**Business Day:**  a day other than a Saturday, Sunday or legal holiday for commercial banks under the laws of the United States or the Commonwealth of Massachusetts.

**Claims:**  demands, claims, suits, actions, proceedings or investigations brought against a person by an unrelated or unaffiliated Person.

**Commencement Date:**  defined in section IV on page 1.

**Common Expenses**: defined in section 7.

**Connection Fee**: defined in section IV on page 1.

**Construction Drawings:**  defined in section 3.

**Damages:**  debts, liabilities, obligations, losses, damages, excluding consequential or punitive damages, costs and expenses, interest (including, without limitation, prejudgment interest), penalties, reasonable legal fees, court costs, disbursements and costs of investigations, deficiencies, levies, duties and imposts.
**Easement**: defined in section 2.

**Effective Date:**  defined in the introductory paragraph.

**FAA:**  the United States Federal Aviation Administration or any successor federal agency established for the same or similar purpose.

**FCC:**  the United States Federal Communications Commission or any successor federal agency established for the same or similar purpose.

**FCC Rules and Regulations:**  All of the rules, regulations, public guidance, written policies and decisions governing telecommunications generally and wireless telecommunications specifically as promulgated and administered by the FCC, which on the Effective Date includes, but is not limited to, those administered by the Wireless Telecommunications Bureau of the FCC and more specifically referenced as the Code of Federal Regulations, title 47, parts 0 through 101, as amended.

**Ground Lease:** defined in section 21.

**Ground Space**:  The portion of the Tower Facility licensed for use by Licensee to locate a portion of the Approved Equipment thereon, in the square footage amount depicted on <u>exhibit B</u> of this Agreement.  In no event shall the Ground Space include the air space or rights above the Approved Equipment located in the Ground Space.

**Hazardous Substances:**  Any hazardous material or substance which is or becomes defined as a hazardous substance, pollutant or contaminant subject to reporting, investigation or remediation pursuant to Applicable Law; any substance which is or becomes regulated by any federal, state or local governmental authority; and any oil, petroleum products and their by-products.

**Holdover Fee:**  defined in subsection 6(c).

**Indemnified Party:**  any person entitled to Indemnification under section 16 hereof.

**Initial Term**:  defined in subsection 6(a).

**Interference**:  defined in subsection 11(a)(i).

**Labeling Fee**: defined in section 9.

**Licensed Frequencies**:  defined in subsection 11(a)(ii).

**Licensed Space:**  Location of the Approved Equipment on the Tower and at the Ground Space as more specifically described in <u>Exhibits A and B</u> attached hereto.

**Licensed User:**  defined in subsection 11(a)(iii).

**Licensee:**  defined in the introductory paragraph.

**Licensor:**  defined in the introductory paragraph.

**MPE**: defined in section 26.

**Notice Address:**  defined in section 19.

**NTP (Notice to Proceed):** Written notice from Licensor to Licensee acknowledging that all required documentation for the construction and installation of the Approved Equipment has been received and approved by Licensor and Licensee is authorized to commence its installation of the Approved Equipment at the Licensed Space, as more particularly set forth in section 10(a) of this Agreement.

**Party(ies)**: Licensor or Licensee.

**Permitted Affiliate**: defined in section 20.

**Permitted Frequencies**: defined in section III on page 1.

**Priority User:**  defined in subsection 11(a)(iv).

**Relocation Application Fee**:  defined in section IV on page 1.

**Remittance Address:**  defined in section II of page 1.

**Renewal Term(s)**:  defined in subsection 6(b).

**RF Emissions**: defined in section 26.

**Site Inspection Fee:**  defined in section IV on page 1.

**SSIS:**  defined in subsection 10(b).

**SSIS Fee**: defined in subsection 10(b).

**Structural Analysis Fee**:  defined in subsection 10(b).

**Subsequent User:**  defined in subsection 11 (a)(v).

**Term:**  Initial Term and each Renewal Term which is effected pursuant to section 6 of this Agreement.

#11552v4

**Tower:**  A communications or broadcast tower owned and operated by Licensor and located at the Tower Facility.

**Tower Facility:**  Certain real property owned, leased, subleased, licensed or managed by Licensor shown on page 1 of this Agreement, on which a Tower owned, leased, licensed or managed by Licensor is located.

**Unlicensed Frequencies:**  defined in subsection 11(a)(vi).

**Unlicensed User:**  defined in subsection 11(a)(vii).

**Utility Fee**: defined in section IV on page 1.

**Work**:  all work relating to the construction, installation, relocation and reconfiguration of Licensee's Approved Equipment on the Tower Facility, including without limitation, construction management, construction of an equipment pad, installation or modification of lines, antennas, shelters and equipment cabinets.

#11552v4

**Appendix II**
**Insurance**

A.    LICENSOR shall maintain in full force during the Term of this Agreement the following insurance:

    1.    Worker's Compensation Insurance with statutory limits in accordance with all applicable state, federal and maritime laws, and Employers' Liability Insurance with minimum limits of $500,000.00 per accident/occurrence, or in accordance with all applicable state, federal and maritime laws.

    2.    Commercial General Liability Insurance (Bodily Injury and Tower Facility Damage), the limits of liability of which shall not be less than $1,000,000.00 per occurrence.

    3.    An umbrella policy of not less than Five Million Dollars ($5,000,000.00).

    The above insurance shall provide that LICENSEE will receive not less than 30 days written notice prior to any cancellation of, or material change in coverage.  The insurance specified in this Item A shall contain a waiver of subrogation against LICENSEE and shall name LICENSEE as an additional insured, and shall be primary over any insurance coverage in favor of LICENSEE but only with respect to and to the extent of the insured liabilities assumed by LICENSOR under this Agreement and shall contain a standard cross-liability endorsement.

B.    LICENSEE shall maintain in full force during the Term of this Agreement and shall cause all contractors or subcontractors performing Work on any Licensed Space prior to the commencement of any such Work on behalf of Licensee to maintain the following insurance:

    1.    Worker's Compensation Insurance with statutory limits in accordance with all applicable state, federal and maritime laws, and Employers' Liability Insurance with minimum limits of $500,000.00 per accident/occurrence, or in accordance with all applicable state, federal and maritime laws.

    2.    Commercial General Liability Insurance (Bodily Injury and Tower Facility Damage), the limits of liability of which shall not be less than $1,000,000.00 per occurrence.

    3.    An umbrella policy of not less than Five Million Dollars ($5,000,000.00).

    The above insurance shall provide that LICENSOR will receive not less than 30 days written notice prior to any cancellation of, or material change in coverage.  The insurance specified in this Item B shall contain a waiver of subrogation against LICENSOR and shall name LICENSOR as additional insured, and shall be primary over any insurance coverage in favor of LICENSOR but only with respect to and to the extent of the insured liabilities assumed by LICENSEE under this Agreement and shall contain a standard cross-liability endorsement.

C.    Notwithstanding the foregoing insurance requirements, (a) the insolvency, bankruptcy, or failure of any insurance company carrying insurance for either Party, or failure of any such insurance company to pay Claims accruing, shall not be held to waive any of the provisions of this Agreement or relieve either Party from any obligations under this Agreement, and (b) Licensor reserves the right, from time to time, to increase the required liability limits described above in Items A and/or B in accordance with then-current customary insurance requirements in the tower industry nationally.